Spear, J.
The defendant is an Ohio corporation, chartered June 27, 1893, and thereby granted the right, privilege and franchise of manufacturing, selling and dealing in oleomargarine and the materials and utensils employed in the manufacture, storage and transportation thereof, and all things incident thereto. Its principal place of business is the city of Columbus. The complaint is that the defendant has, continuously since about the time of its creation, offended against the laws of the state, misused its corporate authority, franchises and privileges, and assumed franchises and privileges not granted to it, and has assumed and exercised rights, privileges and franchises specially inhibited by law in these particulars, to-wit: 1. It has manufactured and sold an article in imitation and semblance of natural butter, which article was made of animal and vegetable oils and compounds with milk or cream, or both, which was not in separate and distinct form and in such manner as would advise consumers of its real character, and was not free from coloring matter, or other ingredients causing it to look like and appear to be butter, which said article was not butter, but was an article made in imitation and semblance thereof. 2. It has manufactured and has offered and exposed for sale, and has sold and delivered, and held in its possession with intent to sell and deliver, in quantities from ten thousand to twenty thousand pounds daily, oleomargarine, containing coloring matter, namely, annatto, and other coloring matter to relator unknown. 3. It has manufactured and sold a substance purporting and appearing to be but *359 ter, and having the • semblance of batter, but which was not butter, but was oleomargarine, and the parcels and rolls thereof were not distinctly and durably stamped, or painted, or marked in the true name thereof in ordinary bold-face capital letters. 4. It has refused and still refuses to deliver and furnish to the duly appointed, qualified and acting inspector and agent of the dairy and food commissioner of the state any sample or quantity of oleomargarine manufactured by it, although duly demanded by him and the value of the same for a ten-pound package thereof or any other reasonable quantity thereof was tendered it for the analysis thereof, and has refused and still refuses to permit said inspector and agent to enter its factory for any purpose whatsoever, and has refused and still refuses to permit him to examine or cause to be examined any of the products manufactured by it. And further, that all of said viola-* tions of law have been made and done by the defendant with full knowledge of the said violations and for the expressed purpose and intent of violating and evading said laws, for the purpose of deceiving the people of this and other states as to the real character of its said product, contrary to the act of March 7, 1890, entitled “an act to prevent deception in the sale of dairy products and preserve the public health.”
Evidence in support of these charges was introduced on the part of Jim state. No evidence was offered by defendant. J Without going into detail, it is sufficient to say that the evidence compels the conclusion that the acts charged have been committed by defendant, and that their frequency and the conduct of the officers of the department in relation thereto, warrant the further conclusion that the acts were committed wilfully and with the intent to disregard the provisions of statute, and to defy the officers of the state whose specific duty it is to enforce the law in this behalf. So that the natural results *360 of all such acts are presumed to have been intended. Objection is offered to the competency of testimony as to acts of the defendant since the commencement of this proceeding. But, inasmuch as the matter of final judgment depends somewhat upon the discretion of the court, we regard this evidence competent as bearing upon the animus, purpose, knowledge and intent of the defendant, and as calculated to aid the court in the exercise of a proper discretion respecting the character of the judgment to be entered.
The defense offered is two-fold. First, that the acts, a violation of which is charged, are unconstitutional as being an arbitrary and unauthorized attempt to interfere with the natural right to conduct a legitimate business, which is beneficial to the public as well as profitable to its promoters; and, second, that this proceeding cannot be maintained because, if the laws referred to be valid, their violation is punishabíé in a criminal proceeding and a definite, adequate, penal sentence may follow a conviction in such proceeding. And, beside, the right to manufacture and vend oleomargarine is not a franchise, and its abuse, should the same be shown, is not the abuse or misuse of a franchise and not the proper subject of a quo toarranto proceeding. Hence, relator has mistaken his remedy and its petition should be dismissed.
The statutes claimed to have been violated are the act of March 7, 1890, entitled “an act to prevent deception in the sale of dairy products and to preserve the public health,” annotated in Bates’ Statutes as sections 4200-13-14, by which it is provided that:
(4200-13.) “No person by himself or his agent, or his employe, shall render or manufacture for sale out of any animal or vegetable oils, not produced from unadulterated milk or cream from the same, any article in imitation or semblance of natural butter or cheese, produced from pure unadulterated milk or cream from the same, nor compound with or add to milk, cream or butter, any acids or other deleterious *361 substance, or animal fats, or animal or vegetable oils not produced from milk or cream, so as to produce any article or substance or any human food in imitation or semblance of natural butter or cheese, nor shall sell, keep for sale, or offer for sale, any article, substance, or compound made, manufactured or produced in violation of the provisions of this section whether such article, substance or compound shall be made or produced in this state or elsewhere.”
(4200-14.) “For the purpose of this act, the terms ‘natural butter and cheese,’ ‘natural butter or cheese produced from pure' unadulterated milk or cream from the same, butter and cheese, made from unadulterated milk or cream, butter or cheese, the product of the dairy,’ and butter or cheese shall be understood to mean the products usually known by the terms butter and cheese and which butter is manufactured exclusively from pure milk or cream or both, with salt and with or without any harmless coloring matter, and which cheese is manufactured exclusively from pure milk or cream or both, with salt and rennet and with or without any harmless coloring matter or sage. It is further provided that nothing in this act shall be construed to prohibit the manufacture or sale of oleomargarine in a separate and distinct form and in such manner as will advise the consumer of its real character, free from any coloring matter, or other ingredient causing it to look like or to appear to be butter, as above defined.”
Also, the act of May 16, 1894, having a like title, now section 4200-16, which reads:
“No person shall manufacture, offer or expose for sale, sell or deliver, or have in his possession with intent to sell or deliver, any oleomargarine which contains any methly (methyl) orange, butter yellow, annatto, analine dye, or any other coloring matter.”
Also, the first section of the act of May 17, 1886, as amended March 21,1887, entitled “an act * * * *362 to prevent adulteration and deception in the sale of dairy products,” now section 4200-30, which provides:
“That no person shall sell, expose or offer for sale or exchange, any substance purporting, appearing, or represented to be butter or cheese, or having the semblance of either butter or cheese, which substance is not made wholly from pure milk or cream, salt and harmless coloring matter, unless it is done under its true name, and each vessel, package, roll or parcel of such substance has distinctly and durably painted, stamped, stenciled or marked thereon, the true name of such substance in ordinary bold-faced capital letters not less than five-line pica in size and also the name of each article or ingredient used or entering into the composition of such substance in ordinary bold-faced letters not (less) than pica in size, or sell or dispose of in any manner to another, any such substance without delivering with each amount sold or disposed of, a label on which is plainly or legibly printed in ordinary bold-faced capital letters not less than five line pica in size, the true name of such substance, and also the name of such articles used and entering into the composition of such substance in ordinary bold-faced letters, not less than pica in Size, if the same be not made wholly from pure milk or cream, salt and harmless coloring matter, and the words ‘Butter/ ‘Creamery’ or ‘Dairy/ or any word or combination of words embracing the same shall not be placed on any vessel, package, roll, or parcel containing any imitation dairy product or substance not made wholly from pure milk or cream, salt and harmless coloring matter.”
Also section 4 of the act of March 20,1884', entitled “an act to provide against the adulteration of food and drugs,” now section 4200-7, which provides that:
“Every person manufacturing, offering or exposing for sale, or delivering to a purchaser any drug or article of food included in the provisions of this act, shall furnish to any person interested or demanding *363 tlie same, who shall apply to him for the purpose, and shall tender him the value of the same, a sample sufficient for the analysis of any such drug or article of food which is in his possession.”
It is not intended here to enter into a general dissertation respecting the origin, or method of manufacture, of oleomargarine, or its usefulness or healthfulness, when manufactured of pure and clean materials and in a cleanly and wholesome manner. It is sufficient to say that it is not, within the meaning of these acts, butter, Avhen made in any manner and of any ingredients; that in its natural state it is nearly Avhite in color, while butter in its natural state is generally (although not always) yelloAV, but oleomargarine when colored can be made and is made to so nearly resemble butter as to be easily, and when not distinctly marked, usually, mistaken for it, and that it may be and often is manufactured from such material and in such manner as to be deleterious to health. With this general statement we proceed to consider seriatim the objections and defenses before stated.
1. The constitutionality of the several acts. What is their purpose and scope? At the outset it should be understood that the statutes do not undertake to prohibit the manufacture or sale of oleomargarine; on the other hand their expressed purpose, gathered from text and title as well, is to regulate its manufacture and sale. In substance they provide that no one shall manufacture for sale any article in imitation of butter, or any compound or substance or any human food in imitation or semblance of natural butter which is not pure butter; that no one shall manufacture or offer or expose to sale any oleomargarine which contains any coloring matter; that no one shall sell any substance purporting, appearing or represented to be butter or having a semblance of butter, unless it be under its true name and with proper mark designating such name, and that all persons *364 dealing in food shall, upon proper application and tender of price, furnish a sample suitable for analysis. Construed with that part of section 2 of the act of March 7, 1890, which provides that oleomargarine may be manufactured “in a separate and distinct form, and in such manner as will advise the consumer of its real character, free from any coloring matter or other ingredient, causing it to look like, or appear to be butter,” it becomes entirely manifest that this legislation is regulation, not prohibition. So that we may leave out of consideration that portion of the argument which seeks to establish on the one hand, and deny on the other, a right in the state to directly prohibit its sale or legislate so as to reach that result by indirection. The question, therefore, is, do the sections of the statute quoted, or any of them, violate our bill of rights which guarantees the right of acquiring and protecting property; or do they in any way violate the constitution as being subversive of the constitutional right to liberty and the enjoyment of property? In other words, is it within the legislative competency to establish regulation for the prevention of fraud and deceit in the sale of articles of food?
We are of opinion that the question is not an open one in Ohio. This court has held again and again that the police power of the state is properly exercised in the protection of the people in all matters concerning their health, and that it is within the scope of this power to regulate the manufacture and sale of articles of food even though the right to so manufacture and sell is a natural right guaranteed by the constitution. Conceding that where the pursuit rests upon natural right, and the product is not harmful, this power may not be exercised in a way which will result practically in inhibition, though under the guise of regulation, and in fostering the interests of a rival product; yet, where the manufacture is conducted in such way as is calculated to deceive, lead the buyer *365 to suppose lie is purchasing an article of food which is everywhere recognized as wholesome, and especially where the article sought to he regulated may easily be manufactured so as to be harmful, and thus result in fraud upon and injury to the public, the police power is properly exercised in the regulation of the manufacture and sale of such article by such requirements as will tend to insure the public against fraud and injury. Its proper disposition is not forbidden. As stated in Jordan v. Overseers, infra, the owner “has power to mortgage the property, or give direction to his labors at his pleasure, subject only to the paramount claims of society, which require that his enjoyment may be modified by the exigencies of the community to which he belongs and regulated by laws which render it subservient to the general welfare.” These several statutes, framed to accomplish this end, entail no particular hardship, are reasonable in their requirements and do not contravene any section of the constitution. Nor is there any question whatever in regard to the power of the state to compel a sample for analysis of any article of food. It would be a waste of space to argue the matter. We hold that in that particular also the statute is reasonable and just. Jordan v. Overseers, 4 Ohio, 295; The State v. Ruedy, 57 Ohio St., 224. Other authorities covering the question are abundant, but it is not necessary to refer to them here. They will be found cited in the briefs of counsel. However, we call attention to a recent utterance of the supreme court of the United States, in Gundling v. Chicago, which involved the right of the city to forbid the sale of cigarettes without a license, opinion by Mr. Justice Peckham:
‘Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and Avhat such regulations shall be and to what particular trade, business or occupation they shall apply, are questions *366 for the state to determine, and their determination comes within the proper exercise of the police power by the state, and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of citizens are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without duo process of law, they do not extend beyond the power of the state to pass, and they form no subject for federal interference.
“It is not a valid objection to the ordinance that it partakes of both the character of a regulation and also that of an excise or privilege tax. * * * So long as the state law authorizes both regulation and taxation it is enough, and the enforcement of the ordinance violates no provision of the federal constitution?”
2. [/The remedy by criminal prosecution. It is enough to say of this objection that the remedy is not adequate. The object of the statute is to protect the public. In the nature of things, a small fine is not a sufficient deterrent to accomplish the desired end, especially in the case of a company possessed of ample means and conducting a large business. The difference between the price at which butter may be manufactured and sold and that at which oleomargarine may be afforded, is so large that the temptation to impose upon the public is too great to be resisted. . In addition to this there are practical difficulties in obtaining convictions which the experience of the dairy and food commissioner, as shown by his report, a public document, fully attests. Rex. v. Ry. Co., 2 B. & Ald., 646; People ex rel. v. Bd. of State Auditors, 42 Mich., 422.
3. The right to manufacture and sell oleomargarine is not a franchise, and hence the proceeding of quo warranto not a proper remedy. It would seem a sufficient answer to this proposition to say that if it be true, then the defendant has no franchise what *367 ever. • Its charter, the certificate of the secretary of state, gives it “the right, privilege and franchise of manufacturing, selling and dealing in oleomargarine,” etc., etc. This authority carries the implication that the business must be conducted in conformity to the laws of the state. It could not have been the, intent of the general assembly, in enacting laws permitting the formation of corporations, to give them power to override the state, although the conduct of the officers of the defendant would seem to imply that they have entertained a different opinion. The time has not yet arrived when the created is greater than the creator, and it still remains the duty of the courts to perform their office in the enforcement of the laws, no matter how ingenious the pretexts for their violation may be, nor the power of the violators in the commercial world.
In order to avoid misunderstanding it may be well to here repeat what substantially appears elsewhere, that there is no inhibition, under the laws of Ohio, of the manufacture or sale of oleomargarine. The requisite simply is that it shall purport to be what it really is, and shall not be so manufactured and put up as to deceive the consumer. Section 4200-14 (Bates) distinctly provides “that nothing in this act shall be construed to prohibit the manufacture or sale of oleomargarine, in a separate and distinct form, and in such manner as will advise the consumer of its real character.” * * *
In the present case the acts of the defendant have been persistent, defiant and flagrant, and no other course is left to the court than to enter a judgment of ouster and to appoint trustees to wind up the business of the concern.

Judgment accordingly.